IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

CATHERINE LOUISE PAULIN )
)
v. ) No. 1:08-0049
) Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:    The Honorable Thomas A. Wiseman, Jr., Senior Judge


REPORT AND RECOMMENDATION

          This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI"), as provided

under Titles II and XVI of the Social Security Act ("the Act").  The case is currently pending

on plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to

which defendant has responded with its own motion for judgment (Docket Entry Nos. 15,

16).[1]  Upon consideration of these papers and the transcript of the administrative record

(Docket Entry No. 11),[2]  and for the reasons given below, the undersigned recommends that

plaintiff's motion be DENIED, that defendant's motion be GRANTED, and that the decision

---

[1]For purposes of future filings, defendant is reminded that the undersigned's scheduling order
in these cases (Docket Entry No. 12) directs the filing of *a brief in response* to plaintiff's motion, not
the government's own cross-motion for judgment.

[2]Referenced hereinafter by page number(s) following the abbreviation "Tr."

1

of the SSA be AFFIRMED.

# I.  Procedural History

Plaintiff filed her DIB and SSI applications on December 17, 2004, alleging that she became disabled on December 19, 2002, due to breast cancer, shortness of breath, and a mental disorder.  (Tr. 82, 110)  Her applications were denied at both the initial and reconsideration stages of review by the state agency (Tr. 46-62, 92-103).  Plaintiff thereafter requested a *de novo* hearing of her claims by an Administrative Law Judge ("ALJ").  The hearing was held on May 16, 2007, before ALJ Linda Gail Roberts (Tr. 524-46).  Plaintiff had a non-lawyer representative at the hearing, and testimony was received from both plaintiff and an impartial vocational expert.  At the conclusion of the hearing, the ALJ took the case under advisement, until July 19, 2007, when she issued a written decision denying plaintiff's claims (Tr. 19-30).  That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since December 19, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. From her alleged disability onset date until March 10, 2004, the claimant did not have any "severe" impairments.  Since that latter date, the claimant's severe impairments have been disc bulges and spondylosis of the lumbar and cervical spines, degenerative disc disease at L5-S1, and the residuals of a modified radical mastectomy with associated chemotherapy and radiation therapy which include mild pulmonary fibrosis and lymphedema of the left upper extremity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part

2

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   Since her alleged disability onset date, the claimant could perform a medium level of work with allowances for the limitations in Exhibits 13F and 14F.

6.   The claimant could not perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on December 30, 1956 and was 45 years old, which is defined as a younger individual age not younger than 18 or older than 49, on the alleged disability onset date (20 CFR 404.1564 and 416.964).

8.   The claimant has at least a high school education and can communicate in English (20 CFR 404.1563 and 416.963).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not she has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering her age, education, work experience, and residual functional capacity, jobs that the claimant could perform have existed in significant numbers in the national economy (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from December 19, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21, 22, 28, 29)

        On July 7, 2008, the SSA's Appeals Council denied plaintiff's request for

review of the ALJ's decision (Tr. 6-9), thereby rendering that decision the final decision of

the Administration.  This civil action was thereafter timely filed, and the court has

jurisdiction.  42 U.S.C. §§ 405(g), 1383(c).  After having been represented below by a non-

lawyer, plaintiff is proceeding *pro se* and *in forma pauperis* in this court.  Nonetheless, if the

3

ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive.  Id.

## II.  Review of the Record

The undersigned hereby adopts the ALJ's thorough summary of the record evidence (Tr. 22-27), as set out below.

[T]he claimant did not submit any medical evidence concerning the period from her alleged disability onset date until March 2004.

In January 2004, the claimant found a nodule in her left breast.  A month later she underwent a biopsy, which revealed a carcinoma.  On March 10, 2004, the claimant underwent a left modified radical mastectomy and, the next day, evacuation of a postoperative hematoma.  A few days after she was discharged, the claimant developed a postoperative infection, which required another brief hospitalization.  Exhibits 3F, 4F, 7F and 15F.

Since the cancer was found to have spread to a lymph node, the claimant underwent chemotherapy soon after and, in August 2004, she started radiation therapy.  In December 2004, the claimant underwent a bone scan, which was negative.  Exhibits 7F, p. 1 and 8F, p. 3.

In July 2004, R. Douglas Kennedy, M.D., the claimant's primary care physician, treated her for sinusitis.  In December 2004, Dr. Kennedy ordered an echocardiogram, which was essentially normal, computerized tomography (CT) of the chest, which revealed mild post radiation fibrosis, and a Holter monitor, which revealed tachycardia [(rapid heartrate)].  He also noted that she had shingles in her left shoulder.  Dr.

4

Kennedy continued one medication for the tachycardia and prescribed others for the shingles.  Exhibit 16F, pp. 11, 13, 16, and 39-40.

In January 2005, the claimant underwent magnetic resonance imaging (MRI) of the right hip, which was normal.  Exhibit 7F, p. 3.

In February 2005, Charles Wendt, M.D., one of the claimant's oncologists, opined that she could lift only 20 pounds with the left arm and should avoid temperature extremes and exposure to sunlight.  Exhibit 8F.

In late March 2005, at the request of the Social Security Administration, Deborah Doineau, Ed.D., a psychologist, interviewed the claimant, who reported that she had quit her last job to take care of her injured son.  She said that her son had been assaulted by a former boyfriend,[3] whom she remained afraid of until he was incarcerated.  While he was still free, however, she developed symptoms of anxiety, and she had feelings of guilt because it was her former boyfriend.  The claimant also reported about being diagnosed with breast cancer and about her immune system being affected by chemotherapy.  She denied ever having received mental health treatment.  The claimant said that she disliked leaving

---

[3]The details of the assault are described in the record as follows:

> [Plaintiff] was living in W.Va., her youngest son came to visit, during the visit the man she was living with got mad because he claimed she wasn't paying enough attention [to] him. Son made him leave the house. Man had a key, came in the house in the middle of the night, hit her son over the head with a steel pipe while he was sleeping. Son was put into a medical coma for 3 weeks in the hospital. After came out of the coma, he came back to Columbia in Dec. 2002, she came with him to help him out. Quit her job, lost her house and health insurance. Son is disabled, has memory and speech problems....

(Tr. 453)

5

her home, although she did go to the store, to doctors' appointments, and to church. The claimant said that during the day she did laundry and household chores and watched her four-year-old grandson and that she "stay[ed] fairly busy." She stated that she had always gotten along with co-workers and supervisors and that she liked to garden and read Stephen King novels. Dr. Doineau found the claimant oriented with a mildly dysphoric mood, a blunted affect, an intact memory, adequate insight, normal judgment, and average psychomotor status. She noted that the claimant did well with most of the mental exercises given to her. Dr. Doineau diagnosed a panic disorder with agoraphobia and a depressive disorder, not otherwise specified (NOS). She concluded that the claimant had a moderate limitation in her ability to interact socially but had no other significant mental limitations. Exhibit 9F.

In May 2005, after the claimant reported back pain, Dr. Kennedy ordered MRI of the lumbar spine, which revealed spondylitic changes and degenerative disc disease at L5-S1 and a disc protrusion and mild spondylitic changes at L4-5. A few days later, the claimant told Dr. Kennedy that she had persistent back pain with numbness and tingling. He also found that she had mild wheezing but no other abnormalities. Dr. Kennedy did not state a diagnosis but prescribed antibiotics. Exhibit 16F, pp. 12 and 36.

In a letter dated June 28, 2005, Dr. Kennedy stated that the claimant had had breast cancer, status post surgery with moderate upper extremity lymphedema. He also said that she had anxiety, depression, chronic tachycardia, chronic low back and neck pain secondary to lumbar and cervical degenerative disc disease, and lumbar bulging discs and spondylosis at L4, L5, and S1. Dr. Kennedy added that she had allergic rhinitis and reiterated that she had anxiety and depression. He said that he had prescribed Tamoxifen for breast

6

cancer, Effexor XR for depression, Xanax for anxiety, Allegra for allergies, and Metoprolol for chronic tachycardia, which he said worsened with exertion. Dr. Kennedy opined that the claimant was "chronically disabled." Exhibit 16F, p. 10.

A few days later, when the claimant's back pain still persisted, Dr. Kennedy prescribed physical therapy and anti-inflammatories. Exhibit 16F, p. 9.

In early August 2005, after reviewing the claimant's medical records, Frank Pennington, M.D., a state agency medical consultant, diagnosed carcinoma of the breast, a back disorder, and pulmonary fibrosis. Dr. Pennington opined that, during an eight-hour workday, she could lift and/or carry 50 pounds occasionally and 25 pounds frequently, could stand and/or walk for 6 hours, could sit for 6 hours, could perform frequent postural activities, could perform frequent overhead reaching, and could perform frequent pushing and/or pulling with the upper extremities. Exhibit 13F.

A few weeks later, after reviewing the claimant's medical records, Thomas Neilson, Psy.D., a state agency psychological consultant, diagnosed a depressive disorder, NOS, a posttraumatic stress disorder (PTSD), and a panic disorder. Dr. Neilson opined that she could understand and remember simple tasks and sustain concentration and persistence for such tasks, could not interact with the general public, could relate to supervisors and co-workers but would have difficulty accepting criticism from the former, could set limited goals, and could adapt to infrequent change. Exhibit 14F.

In October 2005, Dr. Kennedy ordered MRI of the cervical spine, which revealed mild disc bulges at C5-6 and C6-7 without spinal cord distortion or nerve root displacement. Exhibit 16F, pp. 34-35.

A few days later, Dr. Kennedy excused the claimant from jury duty due to the

7

amount of sitting that would be involved.  Suellen Lee, M.D., did the same, although her restriction only applied "at that time."  Exhibits 22F and 23F.

No records from Dr. Lee were submitted as of the date of this decision.

In February 2006, the claimant started seeing Jianping Sun, M.D., a specialist in pain management, for treatment of neck and back pain and osteoarthritis.  After he examined her, Dr. Sun diagnosed cervicalgia, cervical spondylosis without myelopathy, lumbago, lumbar spondylosis without myelopathy, sacroiliitis, and generalized osteoarthrosis.  Over the next several months, Dr. Sun treated the claimant with injections to the neck and back and prescribed medications, which were all generally effective.  Exhibit 21F.

In May 2006, the claimant went to Centerstone Community Mental Health Centers for an evaluation of depression.  She reported about how her son was attacked by her former boyfriend and how he had been left disabled.  The claimant said that she had back pain that had gotten worse and that her depression had also worsened.  She stated that she had problems with sleep, racing thoughts, tearfulness, and forgetfulness and that she was afraid to leave her house and of seeing her son's attacker despite his being incarcerated. During an intake interview, Barbara Conrad, M.S., a Centerstone counselor, found that the claimant had a depressed mood but no other significant abnormalities other than her reported problems with crying, sleeping, and energy level.  Ms. Conrad found that the claimant's strength was that she was intelligent and that her weaknesses were that she could not get disability or health insurance.  She diagnosed a moderate, recurrent major depressive disorder and assigned a Global Assessment of Functioning (GAF) score of 50, which indicated serious, but almost moderate, symptoms.  Ms. Conrad recommended that the claimant

8

undergo therapy and a psychiatric evaluation.  Exhibit 20F.

No evidence was submitted that the claimant ever returned to Centerstone.

In August 2006, the claimant underwent CT of the neck, which revealed a soft tissue mass.  A few days later, she underwent CT of the head, which was normal.  Exhibit 16F, p. 32-33.

No evidence was submitted that the mass was malignant.

In late November 2006, the claimant underwent CT of the lumbar spine, which revealed disc bulges at several levels and degenerative disc disease at L5-S1.  Exhibit 21F, pp. 12-13.

In December 2006, Dr. Sun administered an injection to the claimant's left sacroiliac joint, renewed her prescriptions, and told her to return as needed.  Exhibit 21F, p. 11.

No evidence was submitted that the claimant ever returned to see Dr. Sun.

A few weeks later, Dr. Kennedy referred the claimant to C. Douglas Wilburn, M.D., an orthopedic surgeon, for an evaluation of back pain that had been intermittent until she fell two months earlier.  Since then, she said that the pain was constant and went into her left hip and occasionally between her shoulder blades.   The claimant also said that she had headaches, earaches, sinus problems, coughing, constipation, joint pain and stiffness, depression, anxiety, easy bruising, and swollen glands.  She did not have any complaints about her cardiovascular or neurological systems.  Dr. Wilburn found limited ranges of motion in the lumbar spine, but the rest of the examination was unremarkable.  Dr. Wilburn reviewed the previous MRI of the claimant's lumbar spine, which he interpreted as revealing multilevel degenerative disc disease with some annular tears but no herniations or nerve

9

impingement. He diagnosed multilevel degenerative disc disease and discogenic low back pain and prescribed conservative treatment that included exercises, heat, and medications. Dr. Wilburn specifically stated that she needed to "push her walking and exercising." Exhibit 18F, pp. 15-16.

In March 2007, the claimant told Dr. Wilburn about stiffness in her neck that started a few days earlier and about "a little burning" in her left wrist. Dr. Wilburn found a little puffiness in the wrist but good ranges of motion both in the wrist and the neck. He diagnosed mild tendonitis or arthritis in the left wrist and cervical disc disease by history. Dr. Wilburn prescribed exercises for the neck and told her to continue taking her medications and following her low back treatment program. He noted that she had a transcutaneous electrical nerve stimulation (TENS) unit but did not use it. Dr. Wilburn suggested that she use it, that she "push her exercises. . .[and] her walking more," and that she try physical therapy again. Exhibit 18F, pp. 14.

In late April 2007, the claimant saw Dr. Wilburn after she fell on "her tailbone." She said that she had pain there and in her elbows, wrists, and ankles, left more than right, and that she continued to have back pain. The claimant reported that she had been exercising, walking, and using the TENS unit. Dr. Wilburn found tenderness in the left wrist, but the rest of his examination was unremarkable. He ordered X-rays of the lumbar spine and sacrum, which revealed a little degenerative disc change at L5-S1 but were otherwise negative. Dr. Wilburn also ordered x-rays of the left elbow, wrist, and ankle, which were all normal. He noted that Dr. Kennedy had ordered laboratory tests, which were also negative. Dr. Wilburn again told her to "push her exercises," use her TENS unit, and keep taking her medications. Exhibit 18F, pp. 12-13.

10

At the hearing, the claimant testified that she had had breast cancer, heart trouble, shortness of breath, forgetfulness, headaches, panic attacks, depression, bulging discs in her back, and pain in her right hip and in her left hand and wrist. She said that she had degenerative disc disease (DDD) in her entire spine that caused pain to go into her legs and arthritis in her right wrist that prevented her from gripping or writing. The claimant said that she had heart palpitations that occurred several times a day and once had to go to the emergency room because they continued for an hour. She stated that she had problems with remembering and being around other people. The claimant said that she had been seeing Dr. Lee for two years and that, a year earlier, she started seeing Dr. Kennedy on a monthly basis for shingles, which she no longer had. The claimant stated that she had been taking antidepressants since her diagnosis of breast cancer and chemotherapy treatments. She said that she had seen Dr. Wilburn three times and that she had seen Dr. Sun until December 2006. The claimant said that she had lymphedema in her arm and arthritis in her wrist that Dr. Wilburn treated. She stated that she needed to return to Centerstone for a six-month follow-up appointment. The claimant estimated that she could stand for 10-15 minutes a time, could sit for 5-10 minutes at a time, and could walk for less than a quarter of a mile. She added that she sometimes could not pick up a gallon of milk.

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d

11

124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

12

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional,

13

severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

#### 1.  Plaintiff's Mental Health

Plaintiff's allegation of the onset of disability as of December 19, 2002, coincides with the assault on her son in November 2002, following which she quit her job and left her home in West Virginia in order to move to Tennessee and care for him.  (Tr. 111, 453, 537)  However, the record contains no evidence of any mental health treatment related to this incident until 2005 at the earliest.[4]  Plaintiff did not seek psychological counseling until May 15, 2006, when she presented for an intake assessment at Centerstone (Tr. 449-57).

Both plaintiff and defendant fault the ALJ for misstating the duration of plaintiff's mental health treatment at Centerstone, when she found no evidence that plaintiff returned to care after her initial, intake assessment (Tr. 24-25), and accordingly determined that the credibility of plaintiff's allegations of serious depression and anxiety was undermined.  (Tr. 27)  However, both parties overlook the fact that the evidence of plaintiff's treatment at Centerstone between June 2006 and February 2007 (Tr. 497-523) was not before the ALJ, but was first submitted to the agency in support of plaintiff's administrative appeal of the ALJ's decision (Tr. 475-78).  At the time of the ALJ's decision, the documentary record

---

[4]In his letter of June 28, 2005, Dr. Kennedy reported prescribing Effexor XR for depression and Xanax for anxiety (Tr. 370).  However, it is consistently reported in the record that, prior to that point, Effexor XR was prescribed to treat hot flashes during plaintiff's course of chemotherapy, and that Xanax was prescribed to treat insomnia.  (Tr. 116, 174, 257-60, 269)

14

contained only that initial, May 2006 assessment by Centerstone clinician Barbara Conrad (Tr. 449-59).[5]  Therefore, the ALJ cannot be faulted for overlooking evidence which was not before her, nor can this court consider the after-acquired evidence in the context of its review for substantial evidence supporting the ALJ's decision.  See, e.g., Cline v. Comm'r of Soc. Sec., 96 F.3d 146, 148 (6th Cir. 1996).

Rather, the only vehicle for consideration of the later evidence from Centerstone is the remand described in the sixth sentence of 42 U.S.C. § 405(g), for agency review of new and material evidence that for good cause shown was not earlier incorporated into the record.  A request for this type of remand appears fairly raised by plaintiff's pro se complaint, wherein she claims to have been misrepresented by the group of non-lawyer representatives who handled her claims before the agency, in that certain "records were overlooked or ignored" -- records that reveal a greater degree of limitation than that which the agency considered.  (Docket Entry No. 1 at 1-2)

However, even if these records could be deemed "new" because they had not been made available to plaintiff at the time of her May 2007 hearing (Tr. 475), it does not appear that the evidence is material; that is, the evidence is not so compelling as to create a "reasonable probability" that the ALJ's decision would change if she were to consider it.  See Hollon v. Comm'r of Soc. Sec., 447 F.3d 477, 483-84 (6th Cir. 2006).  In particular, while the

_____

[5]The ALJ does appear to have mistaken the substance of plaintiff's hearing testimony as recalling but one visit to Centerstone, in May 2006, with one followup visit that had not been scheduled as of the day of the hearing.  (Tr. 534-35)  However, it was by no means clear from plaintiff's testimony that she received services from Centerstone on a regular basis following her May 2006 intake, nor did her representative help matters when she failed to examine plaintiff further on the issue.

Case 1:08-cv-00049   Document 17   Filed 05/14/09   Page 15 of 22 PageID #: 87

ability to review these records of plaintiff's repeated visits to Centerstone would presumably change the ALJ's thinking with respect to plaintiff's view of her symptoms and their severity, they do not appear to support any more significant level of impairment than that described in the assessment of Dr. Neilson, which the ALJ adopted for purposes of her RFC finding. The Centerstone records reflect that plaintiff reported doing much better once she was prescribed the antidepressant Cymbalta by Dr. Kennedy (apparently in November 2006 (Tr. 424)), to the point that she terminated services in February 2007 and reported doing fine while staying busy and keeping her two grandchildren every day while their parents worked (Tr. 520-21). But even prior to the end of 2006, the Centerstone records document plaintiff's diagnosis of moderate depressive disorder and the assessment of her therapist that her mental functioning was generally "fair" (Tr. 506-19), consistent with Dr. Neilsen's assessment that her limitations were less than marked. (Tr. 328) While plaintiff was rated on one occasion as having a "poor" or "marked" limitation on interpersonal functioning, due to her report of becoming anxious when in the company of several people (Tr. 453, 509), this level of limitation was not assessed at any other time during plaintiff's treatment at Centerstone. In any event, Dr. Neilson assessed, and the ALJ adopted, a restriction against plaintiff's workplace interaction with the general public (Tr. 332), which would seem to accommodate any episodic difficulty in interacting with more than a few people. In short, the Centerstone records do not amount to new and material evidence sufficient to justify a sentence six remand, and the ALJ cannot be faulted for her handling of the issue of plaintiff's mental functioning in the absence of any further evidence on the record before her.

Regarding plaintiff's other contentions related to her mental impairments

(Docket Entry No. 14 at 4, ¶¶ 1, 8), it is clear that the ALJ did not disregard the evidence of her psychiatric diagnoses, but indeed specifically credited Dr. Neilson's assessment of limitations (including the inability to interact with the general public) based on plaintiff's panic disorder with agoraphobia and depressive disorder. (Tr. 24, 28) Moreover, the one-time assignment of a Global Assessment of Functioning ("GAF") score that broadly reflects either serious psychological symptoms or serious functional impairment by Ms. Conrad at Centerstone (Tr. 457) does not alone outweigh the more detailed functional assessments rendered by Drs. Neilson and Doineau. See Smith v. Astrue, 565 F.Supp.2d 918, 925 (M.D. Tenn. 2008).

Substantial evidence supports the ALJ's findings with respect to plaintiff's mental impairments and resulting limitations.

### 2. Plaintiff's Physical Health

Again, it is clear that the ALJ did not disregard the radiographic and clinical evidence of plaintiff's spinal impairments, nor the evidence of the residual effects of plaintiff's breast cancer and radical mastectomy, both as alleged in plaintiff's motion. (Docket Entry No. 14 at 4, ¶¶ 3, 5) These items were given explicit attention by the ALJ in her decision, as were the medical releases from jury duty (id. at ¶ 6) and the fact that physical therapy was ordered by Dr. Kennedy related to plaintiff's low back pain (id. at ¶ 7).[6]

---

[6]Just as discussed in relation to the Centerstone records, the "new" evidence documenting the substance of plaintiff's physical therapy visits between June and August of 2005, submitted for the first time to the SSA's Appeals Council (Tr. 479-96), is simply not material as required to justify a remand for the ALJ to consider them. These records largely reflect good therapeutic results, including reports of low pain levels. Although these records also reflect plaintiff's subjective report of her inability to sit for any prolonged period, this factor alone does not create a reasonable probability that the ALJ would change her earlier decision. The ALJ has already discounted other subjective

Likewise, the ALJ considered plaintiff's testimony that she experienced heart palpitations several times per day (id. at ¶ 4), though the medical evidence was not found to support any significant limitation from this tachycardia. The ALJ's discussion of these items is provided in her rationale supporting finding number five (Tr. 22-28). While plaintiff plainly does not agree with the weight assigned these items, it is clear that all such items were considered by the ALJ. Furthermore, as pointed out by defendant, the ALJ was not bound to give any particular weight to the state agency determinations which preceded her *de novo* hearing of the case.

Plaintiff argues that insufficient attention was given to the fact that her neck and back pain required injections during 2006 (Tr. 460-70), as well as the prescription by Dr. Kennedy of narcotic medication, including Ultram and the Duragesic (fentanyl) pain patch (Tr. 421, 534), both of which are generally used to treat a level of pain worse than moderate. (Docket Entry No. 14 at 4, ¶ 3) The ALJ did not draw any distinction between these measures and the other conservative treatment which she determined to not support the credibility of plaintiff's subjective complaints. The ALJ did recognize that, despite Dr. Kennedy's June 2005 opinion that plaintiff was "chronically disabled" (Tr. 370),[7] it was not until December 2006 that Dr. Kennedy referred plaintiff to an orthopaedic surgeon, Dr. Wilburn, for the specialist's evaluation of her back ache that had been intermittent but

reports of plaintiff's restrictions on standing and sitting, in favor of the objective contraindications provided by plaintiff's reports of her daily activity level and the assessments of Drs. Wilburn and Pennington.

[7]It was properly recognized by both the ALJ and Dr. Pennington that this opinion by Dr. Kennedy is not a medical opinion for these purposes, but an opinion on a legal issue reserved to the Commissioner of Social Security. 20 C.F.R. 404.1527(e)(1).

became a bit more constant after plaintiff suffered a fall in October 2006. (Tr. 25, 415) The ALJ likewise recognized that Dr. Wilburn's opinions and recommendations were more conservative than those of Dr. Kennedy, including the former's recommendation that plaintiff push her home exercise program and stay active. Dr. Wilburn further observed that plaintiff was not a surgical candidate, and recommended that she stay with the same conservative medication regimen (Tr. 416), which included at various times Celebrex, Zanaflex, Lyrica, Cymbalta, and Ultram.[8] (It appears that Dr. Kennedy prescribed the Duragesic patch in spite of Dr. Wilburn's recommendation to stay the course.) At his last documented visit with plaintiff, Dr. Wilburn observed that he was not sure what to make of plaintiff's subjective pain complaints, as she showed no significant abnormality on blood testing, no radiographic abnormalities, and no significant clinical findings; he recommended she continue pushing her exercises, use her TENS (transcutaneous electrical nerve stimulation) unit, and continue taking Celebrex and Cymbalta. (Tr. 431-32)

Dr. Wilburn's opinions weighed heavily with the ALJ, particularly in light of his status as an orthopaedic specialist. (Tr. 27) The regulations countenance this weighting of the opinion evidence. 20 C.F.R. § 404.1527(d)(5). But even greater weight was given to the report by plaintiff of her daily activities in keeping house and being the daytime caregiver for her young grandchildren, as well as in earlier providing care for her adult son who was disabled after being assaulted in plaintiff's home. As recognized by the ALJ (Tr.

---

[8]Celebrex (celecoxib) is a nonsteroidal anti-inflammatory drug. Zanaflex (tizanidine) is a skeletal muscle relaxant. Lyrica (pregabalin) is an anticonvulsant drug used to relieve neuropathic pain. Cymbalta (duloxetine) is a drug used to treat depression, anxiety, and neuropathic pain. Ultram (tramadol), as referenced above, is a narcotic painkiller.
http://www.nlm.nih.gov/medlineplus/druginformation.html

27), these discrepancies between the opinions of plaintiff's treating physicians, the evidence of her more robust level of daily activity, and her testimony to disabling symptoms and limitations, allow for the latter to be properly discounted as not entirely credible.  E.g., Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997).  Such determinations of credibility are due great weight and deference upon judicial review, id., and may not be properly set aside on the record reviewed here.

Finally, plaintiff argues that the ALJ failed to consider the impact of medication side effects on her ability to function, and that she misrepresented the testimony of the vocational expert.  (Docket Entry No. 14 at 5)  However, contrary to plaintiff's belief, and as pointed out by defendant, the vocational expert testified that plaintiff would only be precluded from working if her subjective testimony were fully credited (Tr. 545).  The expert testimony upon which the ALJ relied revealed that plaintiff's mental limitations would preclude the performance of her past relevant work, but that her combination of impairments and related limitations, along with other vocational factors, would not preclude the performance of jobs such as janitor, production helper, and cutting machine operator (Tr. 28-29, 544).

As to the issue of medication side effects, while there is no explicit mention of their consideration in the ALJ's decision, that appears to be the result of the lack of evidence showing that such side effects were particularly problematic.  Plaintiff does not appear to have complained of any persistent side effects to her physicians, and her hearing testimony merely reflects that her medications have been changed on occasion due to unnamed side effects (Tr. 532).  The side effects she names in her brief are dry mouth, hot flashes,

drowsiness and fatigue, excessive sweating, change in sexual function, swelling of the hands, dizziness, constipation, stomach upset, and weakness, (Docket Entry No. 14 at 5) However, neither the medical record nor the reports of plaintiff and others who know her (Tr. 119-20, 135-54) reflect any significant functional deficits attributable to such medication-induced side effects. Accordingly, the undersigned finds no error in the ALJ's failure to give explicit attention to the issue.

In sum, while plaintiff continues to suffer the emotional effects of the senseless attack on her son, and has battled through the aggressive and invasive treatments necessary to combat her breast cancer, the undersigned finds substantial evidence supporting the ALJ's determination that plaintiff's combination of physical and mental impairments and related limitations is not totally disabling under the Social Security Act. The SSA's decision should therefore be affirmed.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, that defendant's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be AFFIRMED.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt

Case 1:08-cv-00049   Document 17   Filed 05/14/09   Page 21 of 22 PageID #: 93

of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 14th day of May, 2009.


 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE